McFarland, J.,
delivered the opinion of the court.
This record embraces the proceedings in eight several motions, four in behalf of the State, and four in behalf of the county, against Wm. McLean and his sureties, for balances of State, and county revenue, claimed to be due from said McLean, as tax collector *228 of the county, for the period of four years. Four motions were first entered: two in behalf of each, State and' county. These, or some of them, were found to be defective, and four other' motions were entered; but the record shows that the eight motions were all prosecuted. We see no necessity for this, as the four motions last entered embrace everything claimed by the plaintiffs. Upon the hearing, judgment was rendered in favor of the State for balances of revenue for the years 1868 and 1871, and for the county for 1869, 1870, and 1871. The defendants have appealed, and the State prosecutes a writ of error. McLean was elected State and county tax collector for said county at the March election, 1868, and again in 1870, and held the office for two entire terms, making four years, and during this period executed fourteen different bonds, upon thirteen of which judgments are sought in these motions. The several judgments rendered aggregate a very, large amount. The cause has been argued in this court at great length and with very great ability, and many questions of interest presented; and we are very greatly indebted to the counsel engaged for the thorough and exhaustive manner in which they have examined and presented these questions. We deem it proper, in view of the unusual interest attaching to the case, and the manner in which it has been presented, to consider these questions with some particularity.
The first question we will notice is this: It is' argued that these judgments, as to some of the defendants at least, should be reversed and remanded *229 for another trial, upon the ground that the Circuit Judge erred in refusing to empannel a jury upon the demand of the defendants to try questions of fact.
Several of the defendants had filed pleas of non est factum, intended to raise questions to be hereafter considered. W. H. Cherry, one of the defendants, had filed a special plea, which we will notice; there was also an agreement in writing that other special or general defenses might be made on terms, upon the trial. The defendants would probably have had this right without such agreement. The bill of exceptions shows that the defendants called for a jury to try the issue raised by the pleas of non e*t factum, and also the issue raised by the plea of AY. H. Cherry, and also the pleas growing out of the question of the liability of the sureties arising from, and connected with, the alleged misrepresentation of McLean’s condition, and the state of his accounts, made to the sureties when they were about to go on McLean’s bonds in November, 1871, by Esq. T. C. Bleckley, chairman of the County Court, and one of the court who took the bonds. The court offered the jury as to the pleas of non est factum, but refused to allow a jury as to the other issues as prayed for. The defendants declined to accept a jury upon these terms, and excepted to the action of the court.
It will be observed that the demand for a jury, which was refused, was to try issues raised by two special defenses particularly set forth, that is the special plea of AYm. H. Cherry, and the defense predicated upon the false representations alleged to have *230 been made to the securities at the time they executed the bonds of November, 1871, by Bleckley, chairman of the County Court. These defenses were fully gone into upon the trial, and their nature fully disclosed, and we will now examine them and see if in any aspect they could have been available to the defendants.
The taxes for the county for different purposes were assessed separately, that is for county taxes proper, as it was termed, railroad tax, judgment tax, coupon tax, and school tax.
The plea of Wm. H. Cherry avers: “ That he signed and delivered the bond as the surety of Wm. McLean, and on which this motion is based, (the bond to the county of November, 1871,) for the express and sole purpose of covering what is shown and called the county tax proper, and which tax was payable in county scrip, or warrants, or cash, as the taxpayer might elect, and said bond was not designed to cover, and did not cover, the special tax levied to pay judgments, to pay coupon debt, or railroad bond debt, or school tax debt, and as to these he made and delivered his said bond upon the express condition that it did not cover the same; that said McLean had given, or would give, other and separate bonds, conditioned to account for and pay the same.” Beyond all doubt, the security may put in issue the execution and delivery of the bond by a plea that it was delivered as an escrow, only to take effect upon a condition that has never happened, as in Quarles v. The Governor, 10 Hum., 122, where the bond was deliv *231 ered upon the condition that another surety was obtained. If a plea of this character be sustained, it is a complete defense, as it shows that the bond was never delivered, and the obligor was never bound.
On the other hand, where the execution and delivery of the bond is not in fact disputed, then the measure ánd extent of the liability thus created must be determined by the terms of the bond itself, and the laws applicable to the case, and it is ■ not competent to aver and prove that a different measure of liability was intended.
If the law required separate bonds to be given for these separate amounts of taxes, this would be very important in construing the bond, and in determining the liability created by it. This question will be noticed hereafter. Although the effort is earnestly made to place Cherry’s plea upon the principle of the case of Quarles v. The Governor, yet, we think, it amounts simply to an effort to aver and prove by parol that the terms and conditions of the contract were different from the terms of the bond. He concedes that he executed and delivered the bond, but says it only covered a part of the taxes; that it was to take effect upon the condition that other bonds were executed covering the other taxes. If the bond was taken as Cherry insists, and under the law only bound him for the county taxes proper, then it was to him immaterial whether other bonds were taken to cover the other taxes or not. He concedes that, by his own version, he became bound for part of the taxes, and his plea simply amounts to an effort *232 to change the terms of the bond by proof of a contemporaneous parol agreement, which, between individuals, can not be done, 1 Greenl., § 275, much less in a case of this character. Cherry’s • plea upon the trial was supported by his own testimony, and his account of the transaction clearly shows the construction we have given to his plea to be the true one.
The other plea, which it was proposed to submit to a jury, was in substance as already stated: McLean had been tax collector since April, 1868. When these- sureties were called upon to go upon the bonds in 1871, they set about to obtain information as to McLean’s ’ condition; as to how he had discharged his duties during the time he had been in office; and whether he had settled and paid up moneys collected. Several of the sureties, as they • prove, applied to Bleckley, chairman of the County Court, and he informed them that McLean was all right, and was a good officer, and there would be no danger in going upon his bond. This some of the witnesses prove was in substance repeated in open court when the bonds were given. These representations, it is now averred, were false. Concede for the argument all this to be true, could it by possibility be any defense? It is no doubt true, that the act and declaration of an agent, during the continuance of the agency in the lawful prosecution of the business of the principal, respecting the subject-matter of the contract, is evidence against the principal, and generally binding. This is the doctrine announced in the case of Sewanee Mining Company v. McMahon, 1 Head, *233 582, and authority to any extent might .be cited in support of it. The case of Franklin v. Ezell, 1 Sneed, 499, was where an agent was authorized to sell a slave, which he did, warranting the slave to be sound, when in fact she was known to be unsound. The principal ratified the sale. It was held that he was bound by the warranty made by his agent, and liable for the fraud. The authority to sell gave the agent authority to do all that was usual and necessary to effect the sale, and the principal could not avail himself of the benefits of the contract made by his agent, and avoid liability for the fraud that induced it. These principles are sound. But we do not see their application to the present case.
The County Court, by law, acts both for the State and county, in accepting the bonds of the tax collector; the court passes upon the legal form and sufficiency of the bonds, and solvency of the sureties, and, if satisfied therewith, accepts and approves the bonds. To this extent, the court represents the State and county. It is certainly not necessary to the discharge of this duty that the court should make any statement in reference to the character or solvency of the principal in the bond. If the sureties regarded the state of McLean’s accounts, or the manner in which he had discharged his duties for the previous term, as important facts in determining the nature of the risk they were about to take upon themselves, they would of cpurse have to obtain information • as to these facts at their own risk. The question bears *234 no analogy to the sale of property, in which the vendor is under obligations to disclose all latent defects within his knowledge, and is guilty of a fraud in failing to do so. It was very natural that they should desire to examine McLean’s accounts. If he had discharged his duties well, he could himself have furnished them satisfactory evidence upon this question. If they applied to the chairman of the County Court, and it be conceded that he misrepresented the facts, either ignorantly or willfully, these representations were his own individual acts, and not the acts of the State and county. No principle is better settled, or rests upon a stronger foundation, than that the State is not bound for the torts of its public officers, and certainly not for the misfeasance or malfeasance of officers in the discharge of judicial or ministerial duties. See 7 Cranch, 366; The State v. Ward & Briggs, 9 Heis. 100. In cases of this character, this principle is equally applicable to counties. It would lead to most ruinous consequences to Open questions of this character, and hold the State or county bound by loose remarks or expressions of opinion made by public officers, when their duty required no such statements from them, and when it was the folly of others, if they chose to rely upon them. "We hold, therefore, that, conceding the facts to be as claimed by the defendants upon this question, it is not an available defense; and as a result of this, we can not reverse the action of the Circuit Judge in refusing to submit to a jury the two defenses we have considered, for we hold that, if the *235 facts had been found for the defendants as they aver them to be, they would constitute no defense. We do not decide whether or not the defendants would have been entitled to a jury to pass upon a plea setting up facts constituting a valid defense, but for the argument conceding this to be so, we will not reverse and remand the cause to submit to a jury issues when a verdict either way upon such issues would- be immaterial.
In order to present the next question made, it is necessary to state that prior to the election of McLean on the — day of March, 1868, the Legislature passed an act, which, in substance, provided for the organization of a board of five commissioners, who were charged with the duty of superceding the Quarterly County Court of Shelby county in the discharge of all its functions. This board was organized and went into operation, usurping the functions of the Quarterly Court, and, from that time until November, 1869, took upon themselves the discharge of all the duties and functions by law incumbent upon the court, and, during all this period, the Quarterly Court composed of the Justices of the county held no session, and discharged none of their duties. The Commissioners being sustained by the State authorities, their usurpation was successful. The Justices instituted proceedings in the court for the removal of the Commissioners, but failed to obtain a final hearing until after the repeal of the law. It was during this period that the bonds of- McLean for his first term were executed. On the 1st of April, 1868, two *236 bonds were executed — one for the State, and the other for the county taxes. These bonds were taken by the Board of Commissioners, marked approved by their President. The grand jury afterwards,' on the 18th of June, reported to the Circuit Court that these bonds of McLean, as tax collector, were insufficient in amount, and the sureties not sufficient. The Circuit Court thereupon ordered McLean to appear and give new bonds, and he accordingly appeared and executed two other bonds, dated the 30th of June, 1868, which, as the record of the Circuit Court shows, were presented to, and approved by, the Circuit Judge, on the 7th of July, and recorded. It appears, also, that the first-named bonds of the 1st of April, 1868, were, on the 7th of July, presented to the Circuit Judge, who indorsed thereon, “Examined and approved in connection with a subsequent bond taken by this court. G. W. Beeves, Judge, etc.”
These were the four bonds executed during the year 1868. On the 17th of August, 1869, McLean and securities executed two bonds — one to secure the State, the other the county taxes. The execution of these bonds was acknowledged before the deputy clerk of the County Court, who affixed his certificate in the form used for the acknowledgment of deeds. These are endorsed, “Approved by a vote of the Commissioners, signed by the President, pro tern.” They are also endorsed, “Examined, and approved, 6th of November, 1869. G. W. Reeves, Judge, 15th Circuit.”
On the 29th of October, the grand jury again re *237 ported that McLean’s bonds were insufficient, and the record of the Circuit Court shows that, in obedience to an order made upon him, McLean appeared, and, with securities, executed two other bonds, which were approved and recorded. These bonds are dated the 19th of October, 1869, but they were acknowledged before the clerk of the Circuit Court on the 4th of November, 1869, and the approval of the Circuit Judge is dated the same day, and the record of the Circuit Court shows they were presented and recorded on the-6th of November,. 1869.
The argument is, that the bonds taken by the Commissioners were not delivered to, or accepted by, any legally constituted authority; and in law there was no delivery, acceptance, or approval thereof, so as to bind the sureties. This argument has been earnestly pressed in behalf of the sureties upon the bonds of the 17th of August, 1869, but we presume it applies with equal force to the bond of 1st of April, 1868. It is said the law creating the board of Commissioners was unconstitutional, and the Commissioners but usurpers, and their acts nullities; that the Quarterly County Court was the only legally constituted tribunal authorized by law to represent the State and county in taking the bonds of this officer, and it appearing that the bonds were not in fact accepted and approved by the court, or delivered to the court or tó any one for them, it results that the ponds are not obligatory upon the makers thereof.
That the law creating the Board of County Commissioners, so far at least as it authorized said Board *238 to usurp the constitutional functions of the County Court, was in violation of the Constitution, and their acts without authority of law, is a proposition not denied.
We will, therefore, examine this question, for the present treating as nullities the endorsements of approval on the bonds by the Commissioners, and their order to have them recorded. The case of The State v. Shirley, 1 Ire., N. C. Law R. 597, is relied upon by the counsel for the defendants. In that case a single magistrate appointed a constable and took bond from him, and filed it with the clerk of the County Court. The suit was brought for the use of a private individual, who had put claims in the hands of the constable for collection.
The court held that the magistrate had no authority to appoint the constable in the first instance; but it was also held that he had no authority to accept a bond; that the court -was the only agent of the State authorized to accept the bond. It was further held that there could be no presumption of acceptance, because the law had specially provided when and through whose agency alone the bond should be accepted. It was intimated that there might be a distinction as to the presumption of acceptance, when the bond was executed alone for the benefit of' the State, or to secure public revenue. In the subsequent case of The State v. McAlpin, 4 Ire., Law, 140, the same court fully recognized this latter distinction, and it held it to be sufficient, if it appear that the bond was given to the State for purposes *239 which makes it the interest of the State to accept it; acceptance will then be presumed, and this was likewise true, when the funds secured were for county purposes. In this latter case, Judge Euffin said the case of Shirley was decided with serious doubt and hesitation, that a subsequent act of the Legislature made it unnecessary to reconsider the question, yet he says the court would adhere to its authority. The McAlpin case was re-affirmed in State v. Ingram, 5 Ire., 441. The force of the Shirley case as authority applicable to officers in this State, who have been in fact inducted into office, and act under bonds not formally delivered and accepted, is greatly impaired by certain sections of our Code, which will be hereafter noticed.
It is true, the bonds in question in this case were not delivered to, accepted or approved by, the County Court, and the law imposes this duty upon the court in the first instance alone.
It is also true, as a matter of fact, that these bonds were not delivered to the Commissioners to be by them delivered to the County Court, so as to come within the principle strictly of a delivery to a stranger, to be by him delivered to the obligor.
In fact, the bonds were delivered to the Commissioners upon the supposition and belief, doubtless, that they were authorized to accept them; no further delivery was contemplated. Beyond all doubt, the obligors in these bonds did all upon their part that was supposed to be necessary to make the bonds binding and obligatory upon them. They executed and delivered *240 them, without condition or reservation to the party who they supposed was authorized to accept and approve them. They fully assented to the contract upon their part. The law, however, for the protection of the public, has provided that the County Court should judge of the sufficiency of the bonds, and if satisfied, accept them, and the manner of evidencing this approval and acceptance is provided. The result is, that if .thus accepted and approved, the officer is inducted into office, and permitted to enter upon the discharge of his duties, otherwise, he is required to furnish other bonds. These bonds were not delivered to the County Court, and accepted and approved in the manner pointed out, for the reason that the court was not in the discharge of its functions; its place was occupied by others, who had ' successfully usurped its functions. The same result, however, followed to McLean, by the execution of these bonds, as if they had been legally accepted, by the County Court, that is, he was inducted into, and permitted to exercise the duties and privileges of his office. ■
The argument for the defense upon this proposition, if maintained, would lead to this result: Here is the officer duly elected and ready to enter upon the discharge of his duties, and he. actually discharges these duties, but it is impossible that the State and county shall have any security. Why ? Because the County Court, who alone can accept a bond, is kept out of office during the entire term. Ample remedy is provided in case insufficient or defective bonds are taken;, the clerk of the County Court is required to *241 produce these bonds to the Judge of the Circuit Court; if he finds them taken according to law, he shall write upon them “ Examined and approved ” — if he finds they are not taken according to law, it is made his duty to take other bonds. Upon the report of the grand jury that the bonds are insufficient in amount, or the sureties are not good, it is made the duty of the Circuit Judge to take other bonds. Two additional sets of bonds were taken by the Circuit Judge in this case, but not upon the assumption that the bonds of April 1, 1868, and August 17, 1869, were illegally taken. These bonds were not rejected by the Circuit Judge, but on the contrary, are approved in conformity with the statute. As the bonds taken by the Circuit Judge were taken by him as cumulative to the other bonds, upon the report of the grand jury that the .others were insufficient in amount, and the sureties not good, he necessarily passed upon the form of the Commissioners’ bonds, and the solvency of the sureties. He did not take the bonds of June 30 in the place of the bonds of April 1, 1868; on the contrary, both sets being before him, he decided that both sets of bonds taken together were sufficient in amount, and both sets of securities taken together were sufficient, and he endorsed his approval accordingly upon the bonds. Thereby the bonds of April 1 were accepted and approved in the only manner in which the law provides in the absence of the County Court, and the same is the legal result of the action of the Circuit Judge in approving the bonds of August 17, and taking the bonds of November 6, 1869.
*242 Again, these bonds were voluntarily entered into, and the delivery complete upon the part of the obligors. They were not rejected by the County Court, or any other legally constituted agent, but McLean allowed to assume and hold the office; they were executed to secure public revenue, and it is to the interest of the State and county that they be accepted. In such cases, the production of the bond and the motion upon it, is sufficient prima facie evidence of acceptance; and particularly is this so when, as in this case, the court was not in the discharge of its functions so as to formally accept the bond at the time of its execution. This proposition is well sustained by authority. See The State v. McAlpin, 4 Ire., 140; State v. Ingram, 5 Ire., 441; Goodrum v. Carroll, 4 Hum., 490; 15 How., 143; 12 Wheat., 64; 1 Head, 370; 6 Hum., 195.
The case of Shirley v. The State, 1 Ire., does not oppose this doctrine. In Goodrum v. Carroll, the bond was written by the deputy clerk, signed by the obligors in his office, and left upon his table. He afterwards filed it away among the papers of his office, without it ever having been seen by the court, until produced upon the commencement of the suit. It was held a good delivery, and the bond a good common law obligation.
It is argued that when this decision was made, ss. 762, 767, and 768 of our Code had not been adopted. The first of these sections requires that the approval of official bonds shall be in writing, indorsed on the bond, and show the day and year on which *243 they were approved, and be signed by. the approving officer, or authenticated as the act of the court. Sec. 767 provides that no officer with whom any official bond is required to be filed, shall allow the same to be filed in his office, unless the approval of the proper officer or court appear thereon indorsed, according to the provisions of the preceding sections. Sec. 768 enacts that if any public officer, required by law to give bond, performs any official act before his bond is approved and filed as required, he is guilty of a misdemeanor. The argument is, that as the statute has thus particularly pointed out the mode in which the acceptance and approval of the bond shall be evidenced, where these provisions of the statute have not been complied with, no presumption of acceptance can be allowed, and if it be permissible to show an acceptance or approval in any other mode, it ought to be by clear and positive evidence. These provisions of the statute were intended for the protection of the public; to furnish additional safeguards against the danger of public officers being permitted to act under insufficient bonds. But suppose these directions are not complied with; the approval is not indorsed in writing as required, nor is the bond recorded; yet the officer enters into the office and aots under the bonds. Can the failure of the court to endorse the approval in writing upon the bond relieve the obligors from liability thereon? We think clearly not. And if any doubt existed as to this, it is removed by another section in the same article in the Code, which is conclusive in the construction of the sections above referred to.
*244 Sec. 773 is: “Whenever any officer required by law to give an official bond acts under a bond which is not in the penalty, payable or conditioned as required by law, or is otherwise defective, such bond is not void, but stands in the place of the official bond, subject, on its conditions being broken, to all the remedies which the person aggrieved might have maintained on the official bond of such officer, executed, approved and filed according to law.” Now, we do not hold that this section does, or indeed that any statute could, cure a want of delivery. No man ought to be held liable upon a bond that he never executed, but the defect in these bonds we are now considering is that they were not accepted, approved, and filed in the mode pointed out by the statute. The language of this section is, that when the officer acts under a bond “in any respect defective, the bond is subject to all the remedies which the person aggrieved might have maintained on the official bond of such officer, executed, approved-, and filed according to law,” showing, in express language, that while the mode of acceptance and approval is pointed out, yet no mere failure to follow these directions of the statute, in the approval and filing of the bond, will relieve the makers where the officer acts under the bonds. That McLean acted under these bonds admits of no question. That he acted is admitted. He either acted under these bonds or without any bonds. We hold that he acted under these bonds, and the statute, in express terms, applies. This meets the authority of the case of Fletcher v. Light, Barrett & Co., 4 Bush (Ky.), *245 306, even if that case was correctly decided. Now, there is nothing in this record from which any presumption of fact arises that the County Court did any act, either accepting or rejecting these bonds, at any .time between their date and November, 1869. We know, as- a matter of fact, that the bonds during this period were not seen by the court, as it was not in session; they were, therefore, in fact, neither accepted nr rejected, and no sensible presumption of fact can be raised in regard to it. But we hold, upon the grounds before stated, that these bonds were binding obligations, notwithstanding the entire absence of any act of the County Court in regard to them during this period. When the County Court was restored, their first quarterly term being January, 1870, what was the attitude of affairs? McLean was in office; these bonds had been executed, and, in the view we have taken, the liability of the obligors thereunder fixed. It is true the taxes of 1869 had not then been collected, but he had been in office since April, 1868. Was it the duty of the County Court then, in January, 1870, to formally endorse their approval upon these bonds, which had been previously executed? We hold, upon the reasons before stated, that it was at least not essential that they should do so in order to fix the liability of the obligors. The production of the bonds, when the motion is made, is prima facie sufficient, unless there be proof of actual rejection and repudiation; if, indeed, the County Court could, at this late day, repudiate them, they, having been, in the absence of the County Court, accepted, and approved by another authorized agent.
*246 It is argued that the County Court did, in January, 1870, formally accept the bonds taken by the Circuit Court in November, 1869, thereby, by implication, rejecting and repudiating the others; or, at all events, that this repels any presumption of an im- ■ plied acceptance of the other bonds. The action of the County Court in question was as follows: The tax books for the year 1869 had not been turned over to McLean. The Court examined and adopted the assessment made by the Commissioners. The certificate of the clerk of the Circuit Court was then produced, showing that McLean had entered into bonds before tbe Circuit Court to secure the taxes to the State and county for the year 1869. The record of the County Court then shows, that it appearing to the satisfaction of the court, that Wm. McLean, State and county tax collector for Shelby county, has filed his official bonds for the year 1869, with the clerk of the Circuit Court, duly approved by the Judge of said court, it is ordered that the clerk of the County Court turn over to McLean the tax books for the year 1869. The court in this do not undertake to pass upon the sufficiency of these bonds. The bonds were not before them, but they predicated their order upon the action of the Circuit Judge, and we have seen, in a previous part of this opinion, that in the absence of the County Court, the approval of the Circuit Judge was the only other approval required by law. When we look to see the action of the Circuit Judge, we find that the bonds taken on the 6 th of November, 1869, were taken as parts of, and cu *247 mulative to, previous bonds. Would the County Court have had the power to elect to take these bonds by themselves, rejecting the others? The obligation ■ of the sureties upon the bonds of November, 1869, was in effect to become bound jointly wdth the obligors upon the previous bonds, to 'which thesp are cumulative. This was the extent of their obligation. It may well be doubted whether any subsequent action of the County Court could change it; but, in fact, the court did not attempt to do so. The other bonds were not especially referred to, because the -attention of the court was not called to them. The public are nevertheless entitled to the benefit of them.
The question has been earnestly argued as to whether these bonds were in the custody of Loague, as clerk of- the County Court, or as recorder of the Board of Commissioners. The act creating the board made the clerk of the County Court recorder to the board. There is no 'doubt that, while the board were in power, the clerk obeyed their orders. He received these bonds by their direction. The clerk of the County Court is an officer, in some respects, independent of the court. It was the only office that • Loague legally held. He kept his office as clerk and recorder in the same room. It is not very material what particular file of papers he put these bonds in. If material, we should hold these bonds to have been in his possession as clerk of the County Court — the only office we recognize in him. At all events, we hold that those bonds were voluntarily executed; left at the proper place, with the. proper man; were never re *248 jected, but accepted aud approved, in the only mode then possible,, and acted under; and are now produced, and motions instituted upon them, by the State and county, and that the obligors can not now escape liability thereon upon the ground stated.
Again, a defense has been earnestly argued, denying all liability upon the bonds executed to secure the taxes during the first term of office, especially the taxes claimed by the county, upon the ground that these bonds, by their terms, and according to the provisions of our statutes under which they were given, only bound McLean to collect and pay over the legal taxes; that these taxes were not lawfully assessed ; the collector was not bound by his bond or his oath of office to collect them; and, so far as they were collected, they were illegal and unauthorized exactions; that the State, and especially the county, has no title to the money, and the sureties of McLean, particularly, are not bound for these moneys.
So far as the State taxes are concerned, the only recovery had by the State, for any portion of the taxes of the first term of McLean,' was for a balance due for the year 1868. That this tax was lawfully imposed by an act of the Legislature, is not denied. The objection is, that the law required the assessors for each civil district to be appointed by the County Court, or, in certain cases, by the chairman, but during the period in question, the assessors were appointed by the Board of Commissioners, and these assessors assessed the property and polls of the county, and upon a copy of the assessments thus made, the money in question was collected.
*249 It is true the assessors were appointed by the Board of • Commissioners. The County Court and chairman failed to make any appointment. The assessors appointed by the Board proceeded and discharged their duties in accordance with the. forms of law. The people recognized their authority, and the assessments were made and returned.
The clerk made out the copy as required by law, with the proper certificate, and it was upon the authority of these lists that the money was collected. Can the collector and his sureties resist a recovery upon the grouud that the assessors were -illegally appointed? Can -there be any doubt that the assessors were officers defacto? Ve do not say that the Commissioners were officers de facto, as there was no such office; but the assessors discharged the duties imposed by law upon assessors; the public recognized their authority; the other officers of law recognized their acts; they were appointed in accordance with an act of the Legislature; there was no other set of assessors disputing' their right to the office, and they were never removed from office. This assessment was the only one made. Ve are very clearly of opinion that in this proceeding this defense is not available; that it is not necessary, or even allowable, to enquire into the legality of the appointment of the assessors in this proceeding: upon the facts stated, their acts will be taken as the acts of officers de facto. It is a mistake to assume that to constitute a good officer de facto, he must be appointed or elected by the proper authority. The appointment of Horace May *250 nard, Judge of the Supreme Court,.is in point. This court held that the Governor had no authority to make the appointment in the manner he did. Yet Mr. Maynard acted under the Governor’s commission; no proceeding was instituted to remove him; and as to third persons, his acts were to be regarded as the acts of an officer de facto. See Calloway v. Sturm, 1 Heis., 764; see also 2 Swan, 87; 3 Head, 690; 6 Hum., 458; 9 Hum., 162. Upon other grounds, we might reach the same result, but it is sufficient to say that, upon this ground alone, as to the State taxes, the defense is not available.
As to the county taxes of 1869, the rate of taxation for county purposes was fixed by an order' of the Board of Commissioners in June, 1869. The act of the Legislature under which they claimed to exercise this power was unconstitutional. The assessment was illegal and without authority of law, and beyond doubt, might have been repudiated and successfully resisted by the tax-payers. The tax assessors, also appointed by the Commissioners as before stated, assessed the taxable property and polls for the county, and made their returns. The copy of the tax books, required by law to be made out by the clerk of the County Court, had not been turned over to McLean previous to January, 1870, when the County Court were again restored to power, and of course no taxes for the year 1869 had been collected.
Upon the meeting of the County Court in January, 1870, Loague, the clerk, submitted to the court these tax books for the year 1869, together with a *251 written report, in which he shows the assessed value of all the property of the county, and the number of polls; and shows also the assessments made by the Commissioners for the county, setting forth specially the rate of taxation fixed by the county at $1.30 on the $100 worth of taxable property, to wit: general county tax, 60 cents; interest coupon tax, 30 cents; judgment tax, 30 cents; Mississippi River Railroad tax, 20 cents. The report shows the amount that will be realized. The report also shows the amount required to be raised to meet the several demands specified. This report, with the tax books, was by the court submitted to a committee of three of the justices, and the clerk directed to retain the tax books until the committee reported. The committee reported to the court that the amounts assessed were large, but not enough to meet the pressing requirements of the county, as part would not be realized, owing to errors and insolvencies. They reported that the assessments were made by the Commissioners in accordance with law, and they recommended that the tax books be turned over to the collector. The report was received 'and adopted, and accordingly the court, upon being satisfied by the certificate of the clerk of the Circuit Court, that bond had been given, ordered the tax books to be turned over to McLean. This was done, and upon this authority McLean proceeded to collect the taxes. Treating the .levies or assessments made by the Commissioners in June, 1869, as absolute nullities, what is the result? When the County Court come into power in January, 1870, they find that no *252 taxes have been collected for the year 1869, and no tax books in the hands of the tax collector; but books made according to the forms of law. What is the power and duty of the court? Could they still levy a tax, or fix the rate of taxes for the year 1869? See. 4193 of the Code provides as follows: “ The County Courts are required, at the first term in every year, to impose and provide for the' collection of the tax for county purposes, and fix the rate thereof, but if they omit such duty at the first term, it shall be performed at the April, or any subsequent quarterly session.” It is argued that this means some quarterly session during the year. This was most probably contemplated, but the language does not necessarily bear this construction. If the power be not thus exercised, it only increases the taxation for the next year, at least to the constitutional ' limit. We hold, that when the court thus exercises the power, their action is not void; and we further hold the action of the County Court, which we have set forth, to be in all respects equivalent to an order fixing the rates of taxation specified, for county purposes, for the year 1869, upon the assessments made by the assessors, as shown by the tax books. The action of the court can mean nothing else. They fully recognize that the acts of the Commissioners were nullities. The language used might have been more appropriate, but its meaning we think clear enough. It can mean nothing less than this, that the court fixes the rate of taxation for county purposes, for the year 1869, at $1.30 upon the $100 worth of property; 60 cents for *253 general county purposes; 30 cents for interest coupons; 30 cents to pay judgments; and 20 cents for Mississippi River Railroad tax; (these are all specified in the report entered of record), and we direct the tax books upon the assessments already made, to be made out on this basis, and turned over to the collector, as his authority to collect the taxes. The subsequent action of the County Court, at its October Term, 1871, did' not, and could not, change the legal effect of their action in January, 1870. In treating the acts of the Commissioners in June, 1869, as absolute nullities, the taxes imposed for the year 1869 stand upon a ground free from any legal objection in this respect that can avail the defendants.
It is argued that part of the magistrates who were present, and acted in January, were not de jure officers. And if we presume all of this class voted for the action taken by the court, and those who voted against the measure were the legal justices, then the measure did not have the requisite majority of the justices of the county. If necessary to uphold the regularity of the proceedings, we would presume exactly the reverse. There are other good answers to this proposition; but it would extend this opinion to an unreasonable length to notice all.
But, aside from the ground we have stated, we do not admit that, in a proceeding of this character, the tax collector or his sureties can set up any such irregularity or illegality in assessing the tax, as a defense against paying over the money to the State or county, after it has been collected.
*254 We have been referred to very respectable authorities, sustaining, or seeming to sustain, the views of the counsel for the defendants on this question. 5 Ire., 227; 18 Ga., 47; 14 East, 510.
Without attempting to review or criticise these authorities, it will be sufficient to say that we find the converse of the proposition, to say the least of it, equally well sustained by authority, and we think it more in accordance with sound principle, and the spirit of legislation and decisions in our State. The rule is well stated in a section of the Code from the same article from which we have so often quoted.
Sec. 774: “So, -also, if any officer or other person, as hereinafter provided, who is required by law, or in the cause in judicial proceedings, to give bond for the performance of an act, or the discharge of duty, receives money or .property, upon the faith of such bond, fie and his sureties are estopped to deny the validity of the bond, or the legality of the proceedings under which the money or property was obtained.”
If any doubt existed as to whether this section applies to all public officers required to give bond, 'that doubt is removed by the two subsequent sections. McLean was a public officer, required by law to give bond for the discharge of duty. He gave bonds, and he obtained large sums of money from the taxpayers of the county. How? He was the lawfully elected tax collector of the county, upon the faith of the bonds executed by him. He was permitted to enter upon the discharge of the duties of his office; proceedings were had according to the forms of law, *255 under which taxes were levied; the property assessed; tax books furnished the collector, made out as required by law. Under these proceedings, and armed with this authority, he demanded of the tax-payers the amounts thus appearing to be due as their taxes, and the money was paid to him.
The meaning of the above section is, that when the State and county call upon him to account for the money thus collected, he and his sureties are es-topped from setting up, as a defense, the illegality of the proceedings under which he demanded and received the money. And we are of opinion that this section does nothing more than state a sound common law principle. These questions would have been very different, had they been made by the tax-payers, but they were not; and the money is now in the hands of the officer of the State. If it be public revenue, obtained under color of law,, and by virtue of his office, then he can not set up, as a defense, the illegality of the proceedings under which he obtained it.
It is in the hands of the State when in the hands of its officers. Such a defense can no more be. made by a tax collector than by the treasurer after the money has gone into his office through the regular channels of the law. A discussion of the authorities would greatly extend this opinion. We refer to a number of cases more or less. bearing upon the question, and sustaining the principle: 1 Hum., 210; Miller v. Moore, 3 Hum., 189; 2 Wal., 70; 4 Wal., 598; The Governor v. Montgomery, 2 Swan, 613. This latter was a case where the clerk did not *256 certify the tax list as required by law, yet the money was collected upon it. Says Judge McKinney, where the sheriff or collector has actually received public revenue, either under an invalid authority or without any color of authority, neither he nor his sureties can be heard to resist a recovery of the money thus received on the ground of want of proper authority to receive the same.
In Miller v. Moore, 3 Hum., one of the points made was, that the plaintiff in the motion should be required to show the appointment of revenue Commissioners, and a due return by them, and the assessment of taxes by the court. It was held that the tax books, being placed in his hands, was proof enough. It will be observed that, under the principle last stated, illegality in the levy and assessment of the tax will not relieve the collector and his sureties from paying over the taxes, but may be a good defense for failing to collect illegal taxes. We are aware also that a different rule is ajqdicable where the collector extorts from the tax payer a larger sum than the amount assessed as his taxes. As to this excess, the .State or county has no title or claim.. It is not public revenue, and the sureties are not liable for it. But we hold, upon the facts stated, that me moneys in question here are public revenues, and the principle of the authorities referred to is applicable.
The proposition of the-, defendants is again submitted in this form: “That the sureties on the bonds of 1868, 1869, should not be held liable, because those bonds were given to aid the County Commis *257 sioners in carrying into effect a usurpation, violative of the .Constitution and of that vital principle, that the people shall be taxed alone by their representatives; that the consideration of those bonds was illegal — it was to enable McLean to exact from the people a large amount of money contrary to law.” As we have already said, the act creating the Board of County Commissioners was unconstitutional, and we may concede it to have been as argued, a part of a system of gross oppression; yet McLean was the lawfully elected tax collector of the county. In the terms and conditions of these bonds, there is nothing illegal or different from the terms prescribed by law. They simply bind McLean to collect the lawful taxes, and account for the money as required by law; and for this purpose, and to this extent, the bonds are certainly legal. And it can violate no constitutional principle to hold them obligatory to this extent and for this purpose, notwithstanding the illegal interference of the Board of Commissioners and their void and unlawful acts. The remedy, in behalf of the people against this illegal legislation, has been applied; the law has been declared void and repealed. Practically, however, they may have suffered losses that can not be repaired, but to hold that these bonds are not valid for tne purpose of binding Mel jean to discharge the duties imposed upon him by law, and account for money lawfully collected as taxes, would be carrying the remedy to an extreme length.
It has been earnestly argued that the courts should, upon grounds of public policy, refuse to lend their *258 aid to the collection of taxes illegally assessed; that this is necessary to sustain the great principle that there can be no taxation without legal representation and in the mode prescribed by law; that to permit the Government to collect taxes not thus legally hssessed, would give it the power to break down all the barriers protecting the people and give it unlimited power. We should not hesitate to uphold all these provisions of the fundamental law, designed to protect the people from unjust or oppressive taxation, or to restrain the exercise of unlimited power upon the part of the other branches of the Government; but it is not the tax-payer that now asks this protection at our hands. The money in question has been paid, or the greater part of it, by the t'ax-payers as their taxes, without protest or objection. It is now in the hands of the tax collector. According, perhaps, to the weight of authority, the tax-payers could not obtain judgment, even against the collector, for the repayment of the money, we suppose they certainly could not recover against the sureties. Practically, the money is gone from the tax-payers in any event. If lost to the State and county, it will create a deficit to that extent in the State and county treasury. This record shows that the county is liable for heavy debts. We judicially know the existence of heavy State debts. If the State and county fail to receive these sums that the tax-payers have paid as their taxes, the result will be that the deficit thus created in the treasury will have to be supplied by a re-levy of taxes. As to the county treasury, this additional burthen *259 would fall alone upon the people of Shelby county, and they would have to make good all or their proportion of the deficit in the State treasury. So the practical result, should we adopt the policy urged upon us, would be, that the revenue collector, or his sureties, would be allowed to retain this large sum of money, and the tax-payers in the end be compelled to pay the money again. We think this would be a gross perversion of a great principle. This would be to oppress, rather than protect, the tax-payer, and to encourage official defalcation and corruption. It is not now the tax-payer claiming constitutional protection from illegal taxation. The question is now between the State and county and their officer, and the practical question, shall the officer keep the money and throw the burden again upon the people. We may add that it will not be a bad policy to enforce the law strictly against official delinquents, although it may sometimes be hard on their sureties. It seems that nothing short of this will insure fidelity and integrity in public officers.
It is next argued that whatever may be the liability of the collector and his sureties, that the remedy by motion in a case of this character is not given by statute in favor of the county; but it would, have to resort to the common law remedy. The argument, as we understand it, is that these motions do not come strictly within the case provided for in s. 501 of the Code, which gives a motion for a failure to pay the collections into the county treasury on the first Monday in each month. That *260 they do not come within the cases provided for in s. 503, because the motions there given are made to depend upon the revenue docket, required to be kept by the clerk, and this revenue docket in the present instance was not kept at all. In addition to ss. 501 and 503, s. 670 enacts: “For any neglect or refusal to settle his accounts, the Comptroller and judge or chairman of the County Court shall proceed against the collector and his sureties by motion, which shall not be abated, quashed, or delayed by any want of form or informality in prosecuting the same.” Sec. 3614 enacts that: “A motion lies in favor of the party aggrieved, State, county, corporation, or individual, against any tax collector, tax assessor, revenue collector, or Commissioners for money in their hands officially, and not paid over or accounted for according to law.”
Sec. 3583 gives the motion against the sureties in all cases where it is given against the principal.
We hold that these statutes, in clear and unmistakable language, provides for motions upon the grounds upon which the .present motions are prosecuted. The revenue docket would have been a matter of convenience to the county, and for this purpose it was required to be kept; but neither the liability of one officer, or the remedy against him, are to be defeated by the failure of any other officer to discharge this duty. The tax collector can not complain of the absence of the revenue docket. If he had discharged his own duties correctly, he would not have needed a revenue docket to enable him to ascertain the state of his own accounts.
*261 It is argued that as to the State motions, they do not show that the District Attorney-General was instructed by the Comptroller to make the motions, and the statute only authorized it upon such instructions. There is nothing in the position; the authority of the Attorney-General to represent the State can not be questioned in this manner.
It is next argued that the sureties on the bonds executed previous to December, 1869, are released by an Act of the Legislature passed December 16, 1869, the effect of which, it is argued, was to give further time to the collector without the consent of the sureties. The act in question grants no extension of time to the collector; in fact, it' does but little, if any thing, more than re-enact the law already in force. It first directs that the tax books of Shelby county be delivered to the collector on or before the first Monday of January, 1870. It was the duty of the clerk to deliver the copy of the books to the collector, if legally made out, before this act was passed, as much so as afterwards. The act only ■ fixed a limit of time, beyond which the clerk was directed not to delay. The liability of the tax collector and his sureties only commences upon the receipt of the books; he had a reasonable time after this in which to discharge his duties. Code, 504.
We are unable to see that the remaining sections of the act in this respect does any thing more than to direct the collector to do what would have been his duty under the previous laws without the act in question. At all events, it does not grant an *262 extension of- time to the prejudice of the sureties.
It is next argued that the sureties upon the county bonds for the year 1869, are released by the action of the County Court in imposing upon McLean the collection of the' tax known as the Mississippi River Railroad tax, which was a new duty, and not a part of his duty under the law as it previously existed. The action of the County Court, which, it is claimed, imposed this duty, was the action taken by the court at the January session, 1870, already referred to,, adopting the rate of taxes for the year 1869, and ordering the tax book made out, upon this basis, to be turned over to the collector.
This, it is argued, imposed upon the collector the duty of collecting all the taxes contained in these books — the Mississippi River Railroad Tax with the rest. And this being a duty not imposed at the time bhe bonds were given, the sureties are released from all obligation on the bond.
To sustain this, we are especially referred to the case of Pybus v. Gibb, 88 Eng. Com. L. R., 902, a recent case decided by the English courts. The principle of that case seems to be that the obligation of the sureties is, that the officer shall discharge his duties as then fixed by law. Any subsequent law changing these duties, or increasing them, as a consequence, would change the risk of the sureties. If the officer be required, by a subsequent law, to devote his time, or part of it, to discharge of -the new duties, this, to that extent, prevents him from discharging the duties ffir which the sureties were bound, to their prejudice *263 and they are, consequently, discharged from all liability. Conceding this, as a general proposition, to. be sound, it differs from the rule applicable to official bonds in this State, to the extent that the latter are governed by our statutes. Sec. 771 of our Code enacts that “every official bond executed under this Code is obligatory, upon the principal and sureties, * * for the faithful discharge of any duty which may be required of such officer, by any law passed subsequently to the execution of the bond, although no such condition is expressed therein.” We do not agree with the defendants’ counsel, that this section is limited in its application to “official bonds,” as contradistinguished from good voluntary or common law bonds of public officers. The words “ official bonds,” used in this section, denote the bonds of public officers, and, no doubt, include any bond executed by a public officer, and under which he acts; and, besides, there is now but little, if any, practical difference as to these two classes of bonds. See Code, 773, 3884. We do agree, however, with defendants’ counsel that no subsequent law has imposed any new duty upon the collector in this case, so as to make the sureties liable therefor under the provisions of s. 771. As we have already seen, the act of the 16th of December, 1869, directing the tax books for the year to be turned over to the collector, did not change the existing law. The Legislature can not be supposed to have had any knowledge that these books contained this railroad tax; and the act can not be held as imposing upon the collector the duty of collecting *264 this railroad tax. It is not a ease, therefore, where a. new duty has been imposed by law, for which the old sureties are held liable under s. 771. If the duty of. collecting this railroad tax was imposed upon McLean, it was done by the action of the County Court, in January, 1870, by' directing the tax boots, with this railroad tax included in them, to be turned over to the collector. For the argument, we will concede that this .did impose the duty upon McLean, so far as the County Court' had the power to do so. The question, then, is, did 'the court have the power to impose this duty upon McLean?. A chapter of the Code provides for counties subscribing for stock in railroad companies, and empowers the court to levy a tax to pay the subscription. Sec. 1151. This chapter authorizes the cpurt to appoint the revenue collector, or any other person, to collect this railroad tax, and requires a special bond - to be taken to secure the tax. This was the law at the time the bonds in this case were taken, and, beyond doubt, this gave the court the power to appoint McLean collector of the special railroad tax. So, then, if the action of the court at its January session, 1870, amounted to an ’ appointment of McLean to discharge this duty, the court did not exceed its power. The court, it is true, failed to take the special bond required to secure the railroad tax, but this does not affect the liability of the sureties upon the previous- bond. The question here differs from the case of Pybus v. Gibb, in this: In that case, the court held the law to be, that no- new duty could be imposed by law upon the *265 officer, without the sureties upon the previous bond, being thereby released; here, the new duty, which it is alleged has been imposed, (the collection of the railroad tax,) was expressly, authorized by statute, so that the court, in appointing McLean railroad tax collector, if it did do so, acted within the letter of the statute, but failed to take the bond required.
Under the principle of Pybus v. Gibb, it is imposing the new duty which discharges the former sureties, and under the authority of that case, the old sureties would be discharged, although the new duties be secured by a special bond; the principle being, that to require the officer to discharge the new duties, deprives him of the ability to perform those duties for which the sureties were bound. But here, under the chapter of the Code referred to in relation to railroad tax, the power is reserved to appoint the county tax collector railroad tax collector. It is not proposed, however, under this provision, to make the sureties upon the previous bond liable for the railroad tax, but a special bond is required to be taken. Assuming that by law, this duty may be imposed upon the collector, and assuming further, that the sureties on the former bond are not to be liable for these new taxes, then it is immaterial to them whether the new duties are secured by a bond or not.. The result would be, if no special bond be taken, that the county might have no security for the railroad tax. If the action of the County Court did not lawfully impose upon MfrLean this new duty, then he was not bound to perform the duty. In either event, we hold that the liability of the sureties upon the *266 bonds in question, was not affected by the action of the County Court, the question, however, remains, whether this railroad tax is covered by the general bond, and this question we will now consider.
For the. county,, it is argued, that the railroad taxes upon the facts of this case, are taxes for county purposes; and are covered by the general county bond. The County Court is authorized to fix the rate of taxation for county purposes, not to exceed the rate of State tax for the time: see Code 488. In addition, the County Court is empowered to levy various special taxes, to wit: to pay the judgments against the county, to build bridges, to build court houses or jails, and to pay county subscription of railroad stock: see Code 534, 1270, 4211, 1151. No special provision, however, is made for the collection of any of these special taxes, or special bonds to secure them, except as to the railroad tax. The other special taxes are governed by the general provisions.
By chapter of the Code beginning with 1142, the County Court is directed to levy the tax to meet the railroad subscription; the clerk is directed to make duplicate lists of the railroad tax, one to be delivered to the railroad tax collector, the other to be kept in his office, and he shall furnish the railroad company with an aggregate statement of the taxes; the County Court shall appoint the revenue collector, or any other person to collect the tax, who shall give bond in double the installment proposed to be raised, conditioned to discharge his duty, and to collect and pay over the taxes to the railroad company.
*267 The County. Court is, however, authorized to anticipate the collection of the taxes, and to issue warrants bearing six per cent, interest, payable at such times as the railroad company desire, which are to be taken by the railroad company in payment of stock, and if this is done, then the railroad tax collector is to pay the tax, or a sufficient part of it into the county treasury to meet these warrants, instead of paying it to the railroad company, as required by a former section. Under this chapter, it is very clear that taxes thus levied, are separate and apart from the general county tax; that they are to be collected either by a different person, or if by the general tax collector, they are secured by a separate bond, with different conditions; the taxes are to be paid, not to the trustee of the county, but to the railroad company, except where bonds and warrants have been issued, and then the money is to be paid into the county treasury. In the case of the Memphis & Ohio Railroad, Company, and the Mississippi River Railroad Company, bonds, which the county recognize, have been issued, and the stock paid, and, as it is averred, at least part of the bonds negotiated and in the hands of third parties. In this view, the taxes levied to meet these bonds, are not to be paid to the railroad company, but under s. 1161 of the Code, the taxes levied to meet the bonds issued to the Memphis & Ohio Railroad are to be paid into the county treasury.
The taxes levied to pay the interest and bonds issued to the Mississippi River Railroad, are, under a .special law, passed 27th January, 1870, not to be paid *268 to the county treasury, but remain in the hands of the collector, until applied by him to the payment of the bonds and coupons. Where a county subscription, made under the chapter of the Code referred to, has not been paid up by the issuance of bonds or warrants, it is in argument, in effect, conceded that the general county bond does not coyer the taxes, but where the bonds have been issued and the stock paid, then it is argued, that the bonds and coupons become simply a county debt, and must be met like any other county debt, and, as a consequence, the collector and his sureties are liable under the general bond for the collection and payment of this part of the tax with balance. But the question is, does this conclusion follow? When the bonds have been issued, and the stock paid, it is very clear that the railroad company has no further demand, and, it is improper to pay the taxes, when collected, to the company.
It is also true that the bonds and the interest constitute a debt for which the county is bound, and the taxes should be paid into the county treasury, under the Code, 1161, except in the case of the Mississippi River Railroad Company, where, by special act, the collector is to pay the money to the holders of the bonds. But the question is, is this a part of the tax, which the collector and his sureties were bound, under this general bond, to collect and pay into the county treasury? We ha,ve seen that the County Court derived its power to impose this tax under the chapter of the Code referred to: See Code, 1142, et seq.
The court can only impose the tax when authori *269 zed by the Legislature to do so, and the manner must be prescribed: See s. 29, art. 2 of the Constitution. So it results that the County Court derives its power to levy this railroad tax under the above mentioned chapter of the Code, and by this chapter the tax is to be kept separate. A railroad tax collector is appointed by the court, either the regular tax collector or some other person, toho shall give bond in double the amount of the instalment proposed to be raised, and the duty of the collector is to pay the money to the railroad company, except where bonds or warrants have been issued, and then he is to pay the money into the county treasury. But in the event warrants or bonds have been issued, whereby it becomes the duty of the collector to pay the money into the county treasury, this in no degree effects the remaining provisions of the chapter. It is still a separate and special railroad tax, to • be collected by a railroad tax collector, and secured by a special bond, which the law provides shall be given. These provisions are all in force, whether the county has issued bonds or not, the only difference being, that in the one case, the collector is to pay to the railroad company, in the other, he is to pay to the county treasury, but in either event, a collector is to be appointed and a bond given. So we hold, that it was the duty of the County Court to. appoint a tax collector; either McLean or some one else, to collect these taxes — called the Memphis & Ohio Railroad tax, and the Mississippi River Railroad tax, for the years 1869 and 1870, and to take bond as required by law. And constru *270 ing the bonds given for county purposes for the years 1869 and 1870, in this view, we hold that they do not cover these railroad taxes. Such is not their obligation according to the laws then in force. The law did not include these taxes within the bond McLean was then required to give. The court was required to take a special bond of the person appointed to collect these taxes. The sureties on the ordinary county bonds had a right to presume that this positive mandate of the law, had been or would be complied with. Their bonds do not, in express terms, include these railroad taxes, but onl}1- in general terms bind them for the faithful discharge by McLean of his duties as tax collector, and that he will pay to the trustee the county taxes. This must be held to mean the duties as tax collector, and the county taxes other than those falling under the head of railroad taxes. The result is on this point, that these judgments, so far as the railroad taxes are included against the sureties on the county bonds for 1869 and 1870, are erroneous, and will be reversed. The Selma Railroad tax was not levied until 1871, and its collection and payment, as well as the taxes for the ofher two railroads for 1871, are covered by a special bond. We think this conclusion is well sustained by the principle decided in the case of The State v. Bradshaw, 10 Ire. L. R., 229.
Another question is this: The bonds taken in the year 1868, the first year of the first term, in terms bind the collector' and his sureties for the discharge of all duties, and the payment of all moneys collected, or that should be collected, during the entire term of office;' *271 and the bonds of 1870 are in the same terms; and the question is, are the sureties on the bonds of 1868 liable for the default occurring in the year 1869, with the sureties upon the bonds executed in the year 1869, or must the judgment for the default of the year 1869 be confined to the bonds of 1869? And the same question arises as to the bonds of 1870, in regard to default occurring in 1871. This we regard as a question of some difficulty. That the bonds in terms bind the obligors to the extent, claimed for the plaintiff, is not denied; but the argument for the defense is, that the law required bonds to be given annually, and only required the first bond to cover the taxes for the first year, and if the bond of the first year, in its terms, should annex conditions not .required by law, and bind the obligors for the taxes of .the second year, that the sureties will only be bound to the extent the law required the bond to go, and not for those conditions not required by law, under the principle of the cases of Polk v. Plummer, 2 Hum., 500, and Banks v. McDonald, 1 Cold., 84.
By the act of 1835, ch. 15, s. 1, sheriffs of the several counties were declared to be the collectors of State and county taxes, and required to give bond, or bonds. It became a question whether, under this act, the sheriff should, at the beginning of his term, give one bond, covering the taxes for his entire term of two years, or should give one bond at the beginning of each year for the taxes of that year. In Mabry v. Tarver, 1 Hum., 94, it was held that a bond given at the beginning of the term for both years, was a *272 good statutory bond for the second year as well as the first. It was also held, however, under the same statute, that a bond of the sheriff, given for one year only, was likewise a good statutory bond for the year: Nevill v. Day, 3 Hum., 37.
By the act of 1839, the County Court clerk was directed to call on the collectors to renew their bonds on the first Monday of April in each year. After the passage of this act, it was held that a bond of the sheriff covering the taxes for two years, was obligatory for any default occurring in the second year, and this without regard to whether the bond had been renewed or not, as we take it, as no question as to this was made: Governor v. Porter, 5 Hum., 165.
By the first section of the act of 1844, ch. 103, the County Court was empowered to appoint a collector for each year, different from the sheriff, and he was required to give bond at the April Term of the court, but if the court failed to appoint, the sheriff was still to be the collector and give the bond. Under this act it was held that the sheriff, if no collector was appointed by the County Court for the first year, should only give his bond for one year, as it could not be known but what the Court might appoint a collector for the next year; but it was said that if the sheriff gave his bond for two years, it would be a good common law bond, upon which an • action might be maintained for the default of the second year, but a motion would not lie upon it: Broughton v. State, 7 Hum., 193.
In Lay v. The State, 5 Sneed, it was held that *273 the State was entitled to judgment on the bond given in renewal for the second year, for a default occurring in the second year. By the Code the substance of the act of 1844 was adopted. The County Court still had the power to appoint a collector for each year; but if the Court failed to appoint, the sheriff was the collector: Code, 597-8; 'and, accordingly, the collector or sheriff, as the case might be, was 'required, at the April Term, every year, to enter into bond, conditioned to collect and pay the taxes by the last day of December: Code, 599, 492. As the law stood, it may be affirmed, as the proper construction of these acts, that the bond of the sheriff should have been taken for one year only; but if taken for two years, it was a good common law obligation for any default actually occurring in the second year: Broughton v. The State, 7 Hum.; 3 Hum., 37.
By the act of 1859 and ’60, Thompson & Steger’s Statutes, 602a, the law is changed, by providing for the election of • revenue collectors by the people for two years, who are required, “at the first County Court after their election, to enter into bonds, take the same oath, be subject to the same penalties and liabilities, * * * that are now provided by law.” * * 602d. It will be observed that this latter section only required the collector to enter into bonds “at the first County Court after his election,” and does not in terms require this to be done every year. He is to enter into bonds as required by law, and the law then required the bonds to be given each year.
But still the term of office, by this act, is’ *274 made two years, whereas the collector appointed by the County Court held the office for one year. When the collector, under the act of 1859 and ’60, gave his bond and was inducted into office, he was in the office for two years; and although these laws evidently require his bonds to be renewed every year, still this duty might be omitted, and the law, to meet this possibility, might well require the first bond to cover the entire term, and the terms of the section of the act of 1859 and ’60 we have quoted will bear this construction; and, in this connection, s. 761 of the Code, requires the bonds of officers to cover the entire term of the office, unless otherwise directed. See also Code, 771-2.
We hold that the bonds of 1868, covering as they do, in express terms, the taxes for the entire term of two years, constitutes a lawful obligation to that extent upon the makers thereof.
Had McLean held the office for the two years, without giving any bonds in the second year, as he might possibly have done, there could be no doubt that the first bonds, to the extent of their penalty, would be held to cover any default occurring in the second year. This being so, the execution of bonds in the latter year can not be held to discharge that obligation, but only be regarded as cumulative. Even, upon the principle of Broughton v. The State, these bonds, as to the second year’s default, are good at. common law, and we hold that the distinction between statutory and common law bonds is in this respect now immaterial. As the makers of both of these sets *275 of bonds are liable for the default of the second year, we can make no distinction as to the order of their liability, but hold simply that the plaintiffs are entitled to judgments upon both sets of bonds. The rule applicable to guardians’ bonds furnishes no analogy, as the order of their liability was fixed by statute: 11 Hum., 273.
The same rule also applies to the bonds of 1870 and 1871.
It appears that during these several years, McLean collected considerable sums as taxes, where no assessments had been made. It is argued that the law only made it. his duty to report this unassessed property to the clerk of the County Court, and his sureties are not liable for these sums. We hold that the money came into his hands officially; that he collected it by virtue of his office, upon the faith of his bonds; that it belongs to the State and county, and that he and his sureties are liable for these sums, under the provisions of s. 774 of the Code, as well as upon the general principles settled in the eases of Jones v. Scanlan, 6 Hum.; Governor v. Montgomery, 2 Swan.
It is next argued that the sureties are not liable for interest and damages; that the sections of the Code allowing interest and damages at the rate of twelve and a half per cent., only apply in terms against the collector: Code, 736, 503, 3614, 3615. We think there can be doubt upon this question. The Code, 3618, 3615, shows clearly that in motions of this character the recovery shall be the amount not *276 paid over, with interest and twelve and a half per cent, damages on the gross amount, and all costs. All the provisions show that a joint motion is con templated against the principal and sureties. When ever the motion is given against the principal, it is also given against the sureties: Code, 3584. It could hardly be supposed, unless the statutes so direct, that separate recoveries were intended.
The Code embodies the previous statutes upon the subject. Many cases appear in our reports where it clearly appears that the interest and twelve and a half per cent, damages were included against both principal and sureties, and no question made as to the corectness of these judgments, upon these grounds: Lay v. The State, 5 Sneed; 1 Hum., 94.
Again, the following question is presented. The Comptroller’s statement of the collector’s account for the year 1868, show no balance due the- State, but upon the examination of a witness of the defendant, familiar with these accounts, it appeared that upon this statement, the collector was credited with money paid, which was, in fact, money collected for the taxes of the subsequent years. Upon this, the court struck out these credits, and gave judgment for the balance thus arrived at, for the year 1868, with interest and damages. The result was, that these credits were placed upon the account of the subsequent years. This, it is argued, was erroneous. This involves a question which has heretofore been before the court, and that o is, whether the statement of the Comptroller of the amount claimed to be due the State is conclusive, and *277 binds the court to give judgment for the balance thus claimed, leaving the collector to obtain credits for any errors there may be in the judgment, by afterwards applying to the Comptroller. This proposition was decided in the affirmative, by this court, in the case of Allison, et als., v. The State, at this place, at the April Term, 1871. This decision was followed at Knoxville, but without any re-examination of the question. At the last Term at Nashville, these decisions were overruled in the case of Gideon Anderson et als., v. The State. This conflict makes it proper to reconsider the question, and upon re-examination, we are satisfied that the latter holding is correct.
The Comptroller is required to keep an account with all collectors, charging them with all sums received, and crediting them with sums paid into the treasury, for which the collector produces to the Comptroller the Treasurer’s duplicate receipt: Code, 207, sub. sec. 10. By Code, 731, it is enacted, that upon the receipt of the Comptroller’s statement, under his official seal, of the sum claimed by the State against the delinquent, in cases where such statements can be made out, or of the delinquent official bond, accompanied by the Comptroller’s instructions, the District Attorney shall move the court for- judgment. “ The Comptroller’s statement of the amount due the State from any delinquent shall be prima facie evidence of such amount:” Code, 732. Code, 733, says: “The court shall render judgment against him for the amount appearing due from the statement of the Comptroller, or for the penalty of the bond when there is no statement.” The next *278 sections provides, that where there is no statement, and the judgment is for the penalty of the bond, the judgment shall be a judgment nisi, and the' defendant may .have an issue made to prove the amount due: Code, 734. Code, 742, provides that where a judgment has been obtained against a delinquent officer, all bona fide claims due him, properly authenticated, shall be allowed by the Comptroller in the settlement of the judgment. The argument is, that the Code, 733, expressly enacts that the eourt shall give judgment for the amount shown by the Comptroller’s statement — and that Code, 742, provides for afterwads obtaining all just credits from the Comptroller: that the Comptroller is a constitutional officer, entrusted by law with the keeping of these accounts, and courts and juries cannot take upon themselves the power of reviewing or correcting them, without usurping the powers and duties of the Comptroller. Code, 733, must be construed with Code, 732, which in express terms says, the .statement, of the Comptroller shall be prima faeie evidence. The two sections taken together must therefore mean, that the judgment shall be for the amount of the Comptroller’s statement, in the absence of other more satisfactory evidence. Code, 742, is intended to provide for just credits being afterwards obtained, where, for any reason, the collector failed to obtain them upon the trial.
This construction, in our opinion, does not interfere with the constitutional functions of the Comptroller, while the contrary construction does materially interfere with the constitutional functions of the Court. To *279 give judgment between the parties is a judicial power, necessarily involving the right to ascertain the facts according to the rules of evidence, and declare the law resulting according to the right and justice of the easel This is utterly inconsistent with the idea, that the court shall be bound to give judgment for a certain sum, which might clearly appear to the court to be unjust, and leave the party to have this judgment corrected upon an appeal to the Comptroller. This would make the court but an instrument in the hands of the Comptroller, to obey his commands and enforce his orders by judicial decrees and process.
A moment’s examination of the nature of these Comptroller’s statements, will make this view more apparent. The law requires the Comptroller to make a settlement with the collector. These statements, however, are not copies of any such settlements, as none such were probably made. The Comptroller in these statements, first charges the collector with the aggregate taxes for the year — where does he get this? The clerk of the County Court is required to send the Comptroller this aggregate statement when the tax books are completed: See Code, 590. -This is the evidence upon which the Comptroller enters the charge in his books, and from this furnishes the statement. Now, upon what principle, could it be said that this statement of the Comptroller, thus made, is higher evidence of the amount of the taxes, that went into the hands of the collector, than the original books from which this statement was taken? Certainly the collector might prove by these books, or other satisfactory evidence, *280 that the aggregate thus charged is erroneous. But next, as to the credits: the collector is entitled to a credit for errors and insolvencies, to be allowed in a certain manner by the County Court. The County Court, ..pon allowing these credits, orders the clerk to certify a 'copy of the same to the Comptroller: Code, 650, 651. Upon this, the Comptroller enters the credits. Upon what principle can it be said, that the Comptroller’s statement of these credits is higher or better evidence, than the original order of the County Court allowing the credits? And so of payments. The collector may have made deposits or payments to the Treasurer, and hold the evidence in strict compliance with the statute, and yet these may for some reasons not appear on the Comptroller’s account or statement. The argument of the Attorney General is, that the defendants cannot show any such errors. The collector must first apply to the Comptroller and get the corrections made there, and then he can have the benefit of them in court, otherwise not; that the statement of the Comptroller imparts absolute verity.
This, we think, is not a correct construction of the law. From the. manner in which the Comptroller’s statement is made up, it is manifest that it is not and cannot be the higher and better evidence of the true state of the accounts; nor does the statute profess to make it so; nor can there be any sound reason why the court, with satisfactory legal evidence before it, should refuse to give judgment accordingly. Without waiting to have the corrections made in the Comptroller’s accounts, according to the argumént of the *281 Attorney General, should the Comptroller fail or refuse to make the proper corrections, the collector would be • without remedy; would be denied a right of appeal to the courts; the decision of the Comptroller would be final, and his judgment above that of the constitutional tribunal vested with the judicial power. We hold, therefore, that this statement is not conclusive, either for or against the State. This record shows that, to give these statements a conclusive effect, and render judgment accordingly, would make the judgment of the court of no effect.
It is not pretended that these statements show the true state of the accounts, and the judgments when rendered, would leave the matter as far from a settlement as before. It would not be a final adjudication of the rights of the parties, or, in fact, any adjudication at all. This holding does not affect the right of the State, under the statute, to a summary trial without delay. The question then arises, can the court change the credits from the year 1868, for the reason that the money was taxes of a subsequent year? It is argued that the Court should not undertake to adjust the equities between the parties; the money having been paid and received, and the credit given, the liability is discharged. A question similar to this arose before the Supreme Court of the United States, in the case of The United States v. Eckford’s Executors, 1 How., 250, where one Swartout had been collector of customs in the City of New York, for three successive terms, and had given bonds. The action was brought 'for the second term. A transcript from *282 the books and proceedings of the treasury department, during the entire time, duly certified, was in evidence. This contained the account of the collector, kept according to law; credits for payments made after the expiration of the' second term were given to the last term. But it was held, so far as these payments were made in moneys received on duties or bonds, or otherwise charged to the collector as of the preceding official term, the payments should be applied in discharge of the indebtedness of the collector for that term. It was held, that the money was the money of the goverment; that the collector was a trustee to collect and pay it over; that the sureties have a direct interest in its appropriation; that so far as they are concerned, the terms of office of the collector are as distinct, as if different individuals had filled each one of them. That the treasury officers, even with the consent of the collector, would have no authority or discretion to apply the payments differently. We think this principle applies directly in the present case. We do not see that the question here is in any material respect different. It makes no difference that this coui-se was not taken by the court, at the' instance of the sureties. The court was not in error, in rendering the proper judgment at the instance of the plaintiffs. We take the facts, in this respect, to be satisfactorily established by the testimony of Williamson. It is argued, that according to his testimony, it does not sufficiently appear whether the money thus misapplied belonged to the State or county. But we will presume that it belonged to the State, in the absence of *283 anything to the contrary. We are the better satisfied with this course, as it does justice between all the parties, without further litigation.
It is argued, that the money used to pay the balance of 1868, was taxes of ' the year 1869, and that the balance of the year 1869, has been paid; that this rule, adopted by the court, could only be resorted to, at the instance or for the benefit of, the parties liable for the taxes of 1869, and as this latter liability has been satisfied, no such change in the credits can be made. But we hold, that the rule is not thus limited in its application, that the credits may be properly appropriated during the entire period, when the proof authorizes it.
It is next argued, that, as part of these taxes, McLean did not in fact make the collection in money, or anything else authorized by law. In some instances he gave to his securities receipts for taxes, when he, in fact, collected nothing; in other instances he took property. It also appears, that he held checks upon the City Bank “for upwards of $14,000,” and the bank failing, nothing in fact was collected. These checks were given under an arrangement by which the bank sold to the tax payers, checks for Bank of Tennessee notes, and for county warrants, sufficient to pay their taxes. McLean received these checks from the tax payers, in payment of their taxes, with the understanding with the bank, that the bank would pay him in Tennessee Bank notes and county warrants, upon presentation of the checks. It is ar *284 gued, that the sureties should only be made liable where money was actually collected.
We dispose of all these questions by simply holding, that it makes no difference how these tranaetions are regarded, whether as an actual payment to McLean, or a mere failure to collect. -We hold, that in either aspect, he and his sureties are liable. We-have held, that these taxes were all lawfully assessed, were the county taxes for 1869, and the liability of the collector and his sureties, whether he collected the money and failed to pay it over, or simply failed to collect, is precisely the same. His transaction with the bank was his own, as the law authorized no such transaction.
Once more, after the opinion of the Circuit Judge was rendered, but before judgments were entered, an application was made for a new trial, and for a reference to the clerk, and it was proposed, among other things, to show, that a large portion of the balance due the State was collected in notes of the Bank of Tennessee, receivable for State taxes, and a' large part of the taxes due the county collected in county warrants; that both the Tennessee Bank notes and the county warrants were passing at a great discount, and that the sureties are only liable for the actual value of the bank notes and county warrants. Conceding, for argument, that these facts had fully appeared to the court, we do not see how it could avail the defendants. These Tennessee Bank notes, if collected by McLean, should have been turned over to the *285 Treasurer. They would then have been cancelled, and the liability of the State for them at an end; but, instead of this, he appropriates them to his own use, and they have either been taken up by the State for other taxes, or are still outstanding, and the State bound to receive them when presented, at par. They represent their face value to the State. They stand dollar for dollar, and when presented in payment of taxes, are received at their face value, and are therefore worth to the State their full amount. And so of county warrants. Between individuals they may be sold at a discount, but the county is bound for their nominal value. The collector says to the county: I hold $100,000 of your warrants, collected for that amount of taxes due you; these warrants represent debts to that amount due from you, and if turned over into the county treasury, will extinguish absolutely $100,000 of the county’s indebtedness. But instead of this, he says: I will appropriate to my own use these $100,000 of warrants, and pay you their market value, say $50,000. The result is, that in the one case, $100,000 of the debts of the county are extinguished, in the other, this $100,000 of debts are left outstanding, and the county in the place of them gets $50,000. And it is said, that all the sureties have to do, to account for these, warrants of the county, which have been in reality taken up, is to pay their market value. We think this proposition need only to be stated; that it requires no argument to refute it; we can discover no ground upon which the liability of the sureties can be held to fall short of the liability of the principal, as to this matter.
*286 We think there was no error in the court hearing these motions at the same time. The result of this may have been to remove embarrassments, that might otherwise have been in the way .of the plaintiffs, but we do not see that the defendants have for this cause, been embarrassed in making any valid and legitimate defenses. Nor was it error in the court to refuse to refer the case to. the clerk for an account. The court might, for its own convenience, have taken this course, but failing to do so was not error. It is said, there were errors in the amounts of these judgments, but the errors have not been pointed out. We regard the accounts, in connection with the testimony and statements of Williamson, as furnishing satisfactory data for arriving at the correct amounts. If any errors be pointed out they will be corrected.
The Attorney General asks a reversal of the judgments, because credits were given for errors, and insolvencies allowed by the County Court improperly. That is, the County Court allowed these credits for the years 1869-70, in the year 1872, when this was not authorized, that the law requires this application to be sooner made. We understand the statutes to vest this jurisdiction in the County Court exclusively — no claim for such credits, could be regarded, unless they are first allowed by the County Court,, but where the court allows the claims, its action is judicial in its character, and we cannot in this proceeding certainly, review,- reverse, or correct this judgment. It must be regarded as conclusive, unless we could affirm' that the County Court had acted without jurisdiction, and this *287 we cannot do. We must presume that the facts, authorizing the court to take this action under Code," 655, were made to appear.
It is next argued, that credits have been, allowed the collector as commissions, for collecting and paying over, when none are allowed by law. Section 668 of the Code enacts that: “No commissions shall be allowed any collecting officer, for collecting and paying over any public money, unless he make settlement and payment as required by law.” To hold, where a collector had discharged his duties for the greater part of this term correctly, and paid over the greater part of the money according to law, but had failed to pay a small part, or had in some respect failed to settle strictly according to law, that he should, for this, forfeit his just compensation for the duties he had correctly performed, would be a harsh construction of this statute, and we should hesitate to so construe it, if it be susceptible of any other construction.[1]
In the case of Lay v. The State, 5 Sneed, 604, this court reversed the judgment for the reason, in part, that the Circuit Court had disallowed the commissions shown in the Comptroller’s statement. There is no discussion of the question, but the point was directly presented and adjudged. We do not regard the statute as so. explicit as to require all commissions absolutely to be disallowed, and we will, therefore, not disturb the judgments upon this ground.
*288 The result of the entire case is, that there are no errors in the record, except as before shown in regard to the taxes levied for the years 1869, 1870, to meet the county bonds issued to the Memphis and Ohio Railroad, and the Mississippi River Railroad.
The judgments will be corrected by striking out the part based upon these taxes, and in other respects affirmed.
The death of one of the defendants since the argument of the cause, being suggested and proved, and a motion for judgment notwithstanding, McFarland, J., on the 18th of October, 1873, delivered the following opinion:
This cause was argued at the last term of this court, and held under advisement, and at the present term, an opinion has been announced, affirming the judgment of the court below, against McLean and his sureties. It is now suggested, that since the last term, one of the sureties has died, and the question is, must the cause be revived against the personal representative of the deceased party, before judgment can be entered ?
In the case of Perry v. Wilson, 7 Mass. R., 393, upon this precise question, it was held, that the judgment should be entered as of the preceding term, the court observing, that when the act was delayed tor the convenience of the court, they would always take care that no party should suffer by such delay.
In Sappington v. Philips’ Ex’rs, 1 Yer., 105, it was said that if either party died after assignment *289 of errors, the court would proceed to judgment without notice of the death, but a revivor was necessary if the death occurred before the assignment of error. We now have no assignment of error; but as the cause was argued at last term, and held by the court under advisement, we hold that, the judgment should be entered as of the last term, without notice of the death. The representative of the deceased party could only contest the right of revivor against him. We suppose there can be no levy of execution upon the effects of his intestate in his hands, without revivor of the judgment against him. The' judgment will be as directed, without notice of the death. We think there is no statute in conflict with this course.
The Attorney General waiving the entry nunc pro tuno, preferring to preserve the judgment lien for twelve months, the judgment was entered of the present term, with leave to revive as to the deceased party, before execution issued.

 All these provisions are intended to compel settlements and payments, and are well calculated to attain the end if enforced. Now, these cases do not justify the allowance, where the Comptroller has not allowed it. Rep.